**IN THE COURT OF APPEALS OF IOWA**

No. 23-0665
Filed August 30, 2023

**IN THE INTEREST OF J.B., K.B., and P.S.,**
**Minor Children,**

**F.Y., Father of P.S.,**
    Appellant,

**E.S., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Hamilton County, Hans Becker, District Associate Judge.

The father of P.S. and the mother of all three children separately appeal the termination of their parental rights.  **AFFIRMED ON BOTH APPEALS.**

Alesha M. Sigmeth Roberts of Sigmeth Roberts Law, PLC, Clarion, for appellant father of P.S.

Douglas Cook of Cook Law Firm, Jewell, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Justin J. Kroona of Kroona Law Office, Webster City, attorney and guardian ad litem for minor children.

Considered by Bower, C.J., Buller, J., and Scott, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**SCOTT, Senior Judge.**

F.Y., who is the father of P.S., and the mother of all three children separately appeal the termination of their parental rights.[1]  F.Y. claims termination of his parental rights is not in the child's best interests.  The mother contends she should have been granted a six-month extension to seek reunification, termination of her parental rights is not in the children's best interests, and her bond with the children should provide a basis to avoid termination.  We affirm on both appeals.

In March 2021, these children—P.S., born September 2015; K.B., born July 2017; and J.B., born in February 2019—came to the attention of the department of health and human services (HHS).  Ernest was holding J.B. and fell on top of the child because he was intoxicated, injuring the child.  He was arrested for child endangerment.  In April, J.B. and K.B. suffered burns from a hair straightener that required medical treatment, and they tested positive for methamphetamine and marijuana upon drug testing.  The mother admitted to having relapsed on methamphetamine and indicated she used marijuana daily.  In May, domestic violence between the mother and Ernest occurred in the children's presence; Ernest was arrested.  Each of these incidents invoked a child abuse assessment, and each was founded.  The mother cooperated with voluntary HHS services, including a safety plan, family preservation services, child safety conferences, family centered services, and family team meetings.  The mother agreed to obtain a substance-abuse evaluation and follow any recommendations.

The mother did not appear for requested drug testing on June 1.

---

[1] The father of J.B. and K.B., Ernest, also had his parental rights terminated; he does not appeal.

On June 2, the children were voluntarily placed in foster care after the mother violated the safety plan and, on June 7, petitions were filed alleging the children were children in need of assistance (CINA). An HHS report to the court noted the mother appeared for drug testing on June 7, and the urinalysis collected that day tested positive for marijuana; a sweat patch tested positive for methamphetamine and marijuana. She missed a scheduled substance-abuse evaluation appointment. The report to the court notes, "Mother reports that the children were placed in foster care in another state as well. The children were a bit nervous during the removal process, but it was evident that they had experienced a removal in the past."[2]

On July 21, all parties stipulated and an adjudication order was filed finding the children were CINA under Iowa Code section 232.2(6)(c)(2) (2021) (imminently likely to suffer harmful effects as a result of the failure of the children's parent to exercise a reasonable degree of care in supervising them). Per that order, the mother was to abstain from the use and possession of all mood-altering substances, undergo a substance-abuse evaluation and follow all recommendations, sign all necessary releases, participate in requested drug screening, participate in recommended mental-health counseling and treatment, and enter into a contract of expectations if requested by HHS.

A report to the court in anticipation of the September 8 dispositional hearing noted P.S. had "explosive tantrums" and was described as "aggressive and hostile

---

[2] The report also indicates that after initially cooperating with HHS services, Ernest moved to Texas. He later moved to another state.

P.S.'s father was in prison serving a thirty-year sentence for statutory rape and kidnapping; his tentative release date is in May 2045.

toward younger siblings." After the initial foster family was no longer a placement option, the children were moved; the two younger children were placed in one foster home and P.S. was placed in another. The reporter stated, P.S. "struggles some with behaviors and tantrums" and "has become physically aggressive and destructive of property when upset." The reporter also summarized the mother's situation:

> The mother continues to struggle with substance use and housing instability. She entered treatment and stayed for only two days. Her drug test upon entering treatment was positive for amphetamines, THC and alcohol. Mother has not reached out to providers since leaving treatment. She has been sporadic in her visitation and the relationship between she and the children is suffering.

An uncontested dispositional hearing resulted in the children remaining out of the mother's custody and a review/permanency hearing was scheduled to be held on December 1.

In a November review hearing report, the HHS worker noted the mother "continues to struggle with consistently engaging in services" and had "sporadic contact with providers." The mother had completed a substance-abuse and mental-health evaluation and had "disengaged in those services for several weeks but has reportedly recently re-engaged." The mother "expresses desire and motivation to engage in services and work toward reunification" but "struggle[s] to put her words in to action." She was not consistent in attending visits with the children. The worker also noted the mother was living with a friend, was unemployed, and had lost ownership of her vehicle.

The December hearing was uncontested, and the juvenile court continued out-of-home placement for the children. The expectations of substance-abuse and mental-health treatment remained for the mother.

In a March 2, 2022 order, agreed to by all parties, the court indicated the mother "is currently not engaged in any services" and the children would remain in foster care. A review hearing was scheduled for June.

A June 3 review hearing report was prepared by a new HHS worker assigned to the family. J.B. was doing well, displayed no behavioral issues, had "drastically increased his vocabulary and communication skills," and was eating and sleeping well. K.B. was struggling with defiant behaviors and cursing at school; was on a waiting list for play therapy; had an evaluation based on concerns with his behaviors and focus issues, which resulted in medication being prescribed; and challenged adults. The foster parent for J.B. and K.B expressed a willingness to be a permanent placement option for J.B. but not K.B. P.S.'s tantrums and behavioral issues were improving in her new foster home. But she seemed to have a setback, which may have been related to a sibling visit that did not go well[3] and concerns about moving because her foster mother was moving out of the area.

The HHS worker also reported,

> [t]he mother is not consistent in visitation with the children, as no visitation has occurred since November. . . . She does not consistently schedule appointments with her [family centered services] worker. She is not currently participating in any mental health or substance abuse services. [She] does not have income or suitable housing at this time. [The mother] expresses desire to have her children in her care but struggles to follow through with action steps toward reunification.

---

[3] After ten minutes, P.S. refused to interact with the younger two children.

The juvenile court entered a review order on June 8, noted the mother's lack of participation and progress, and scheduled a permanency hearing be set in July.

J.B. and K.B. were moved to another foster home in June and expressed anxiety about time outs with their new care providers.[4]  Sibling visits were set up and arrangements were made to have P.S. transition into the same foster home as J.B. and K.B. by mid-July.

A permanency hearing was held on July 20.  After considering the reports filed by care providers, the permanency plan, and the statements of counsel, the juvenile court found

> convincing evidence exists showing that termination of the parent-child relationship would not be in the best interest of the children at this time because the children have recently moved to a new placement; therefore the children are not currently adoptable because they have not been in their placement for 180 days.  As shown by the reports and the case permanency plan, services were offered to the family to correct the situation which led to the removal of the children from the home.  However, the court finds that the children cannot be returned home at this time.

Consequently, the court continued the children's foster placement for an additional six months.

A review hearing report filed October 7, 2022, indicated the children had been living together since July and P.S.'s "tantrums and behaviors appear to have improved in this foster home."  The report noted the family was working on the sibling relationship and the foster parents "are great at helping the kids work through their feelings when they express frustration, form of discipline is talking

---

[4] A report of excessively long timeouts and a spanking by the foster mother prompted the children's move to the new foster home.

through what happened and working through it. . . . Though the children have tendencies to have confrontations they have transitioned well and continue to make progress being together." This foster family expressed interest in adopting all three children.

The report preparer indicated the mother did not have regular contact with service providers, was not participating in services or visits, and was in jail on September 7. The HHS worker met with her at the jail and the mother admitted she had relapsed on marijuana and would be missing a substance-abuse evaluation and an employment interview that day because she was in jail. After being released from jail, the mother had no phone and had to be personally contacted at her home. The mother failed to show for a drug testing as requested on September 30 and did not answer the door when a service provider arrived to transport her to a scheduled substance-abuse evaluation.

The report preparer also noted F.Y. remained in prison. Both his wife and his mother asked to be considered as possible placements for P.S.[5] An interstate compact home study was requested of the wife's home, and the department of human services in Mississippi denied her eligibility as a possible placement. The paternal grandmother's request was withdrawn when she admitted her health was too poor. HHS asked that a petition to terminate parental rights be filed with respect to all parents.

The children's guardian ad litem (GAL) agreed with the termination recommendation.

---

[5] Neither has ever met P.S., though the wife had been in contact with HHS.

On October 19, the juvenile court entered a review order, noting HHS's recommendation for termination and that there were three more months left in the extension previously granted for the parents to work on reunification. The court ordered a permanency hearing set in January 2023.

A January 18, 2023 permanency report to the court was prepared by HHS social worker Jessica Mulenbruch, who indicated the children had been removed from parental custody since June 2, 2021. The children were making progress in their current placement and receiving needed services, they were bonded with their foster family, P.S. felt safe with them, and the youngest two said they wanted to stay with them forever.

With respect to the mother, Mulenbruch reported she was in jail from October to December 2022. When Mulenbruch met with the mother in November, the mother reported she had a substance-abuse evaluation scheduled for December 14; was working on job applications with a family support specialist (FSS); and expressed the intent to take GED classes, address her mental-health issues, get on appropriate medications, get housing and a vehicle, and participate in outpatient substance-abuse treatment to maintain her reported two to three months of abstention from methamphetamine and thirty-two days abstention from marijuana.

Mulenbruch reported the mother had not attended a visit with the children since September 29, 2022. "There was an interaction scheduled for December 16, 2022, [the mother] did not confirm her visit that day, an interaction did not happen. Supervised interactions continue to be available, FSS and HHS have not been able to get ahold of [her] since Dec[ember] 12, 2022." While the mother did

attend the substance-abuse evaluation, which recommended intensive outpatient treatment, she did not attend drug testing requested for December 17 and January 4, 2023. Mulenbruch again requested petitions for termination of all three parents' parental rights be filed.

On January 25, F.Y. testified at the permanency hearing, stipulating he had no contact with P.S. since sometime in 2019, but claiming almost daily video contact with the child between 2017 and 2019. He also claimed he was innocent of the statutory rape conviction and had an ongoing appeal. He verbally requested video visits be initiated with P.S.

The court found:

> None of the parents have progressed off of fully supervised visits since the children were adjudicated as [CINA]. The mother has had only one supervised interaction with the children in the past year. . . . Ernest . . . admits he is not in a position to care for his children on a full-time basis, he has not had an in-person interaction with his children in over a year, and he hasn't had any communication with his children in over five months. Neither Ernest . . . nor [the mother] have complied with treatment evaluations and recommendations. . . . [F.Y.] is incarcerated for statutory rape and kidnapping a minor, convictions in the State of Mississippi[,] and his tentative discharge date isn't until 2045. [F.Y.] has never had an interaction with [P.S.] during the entirety of the case. . . .[6] None of the parents have made reasonable progress towards reunification in this case. The court further finds there is not a reasonable likelihood that granting the parents an additional six-month extension will result in custody returning to any of the parents.

---

[6] The court granted seven days for the GAL to investigate F.Y.'s claims he previously had contact with P.S., after which it would rule on the request for video visits. The court also noted F.Y. had previously asked that his immediate family be considered as possible placements for P.S. and outlined the State of Mississippi's rejection.

On February 2, the juvenile court found F.Y. "did not present any evidence, other than his own testimony, that he previously had contact with the child" and "due to the nature of [his] convictions, the length of his sentence, the nature of his parenting deficiencies, and the lack of any bond between the father and the child" video visitation was not in the child's best interests.

The court denied the requests for extension of time and ordered the filing of termination-of-parental-rights (TPR) petitions, which occurred January 27, alleging termination was appropriate pursuant to Iowa Code section 232.116(1)(e) and (f) (2023).

Mulenbruch filed a termination-hearing report on March 7 noting the mother had signed a contract of expectations on February 8 but had not addressed her substance use and, though the mother wanted to make positive changes in her life, she has "shown no follow through the entirety of this case." Mulenbruch recommended termination of parental rights and permanency for the children.

The GAL submitted a report, which states in part:

> 4. I have observed the home of the children and it is safe and appropriate for them. The children appear happy in their placement. Their needs are being met by the foster parents. The children have stability and a home free of drug use and domestic violence. It appears that [P.S] and [K.B.] will require therapy to help them process the trauma they have experienced.
> 5. Since the permanency hearing on January 25, 2023 there has been little to no progress made towards reunification for any of the children with their parents. [F.Y.] remains incarcerated, [Ernest] remains out of state, and the mother has not followed through with one of the main requirements asked of her by [HHS].
> . . . .
> 8. The mother has not addressed the issues that have been present for the entire length of the CINA case: she has not completed substance abuse treatment. In fact she was discharged from the only local provider of treatment for not attending treatment and is not eligible to get services from them until March 20, 2023. She does not have stable housing, having to rely on male friends (it is unclear if they are romantic partners or just friends) for housing. These male friends have histories of drug use and/or domestic violence. This reporter does not believe reunification on the date of the hearing is possible and has doubts about the mother's ability to be in a better position if she was granted six more months.

The GAL stated he was in agreement with HHS's recommendation for termination of parental rights absent "compelling evidence to the contrary."

At the March 29 termination hearing, Mulenbruch testified consistent with her termination report and recommended termination of all parents' rights.

The mother testified she had obtained employment at a hotel, which also provided her a room and access to a kitchen, about a month before the termination hearing. She believed the children could safely live with her in the room. She claimed she had not used an illegal substance since she was arrested in October 2022 and was going to start substance-abuse treatment later that week. She stated she was seeing a counselor. She also testified she and the maternal grandmother had made amends, and the grandmother could be a support for her. On cross-examination she acknowledged she had not seen any of the children since September 2022 and did not know where they attended school. She did not know how to reach the foster parents and had not kept in contact with her caseworkers. She also acknowledged the grandmother could also be a trigger for her substance abuse and testified, "We have our ups and our downs. We have been like that my whole life."

The juvenile court terminated the mother's and F.Y.'s parental rights on both grounds alleged in the petition. On appeal, the F.Y. contests the court's finding that termination of his parental rights was in P.S.'s best interests. The mother maintains the court should have granted her an additional six months in light of her stated progress at the termination hearing, termination of her rights is not in the children's best interests, and because "the children have a bond with her," we should apply a permissive exception to termination.

On our de novo review, *see In re W.T.*, 967 N.W.2d 315, 322 (Iowa 2021), we affirm on both the father's and mother's appeals.

> In analyzing whether parental rights should be terminated, we use the three-part process from Iowa Code section 232.116 and determine (1) whether the State proved any grounds for termination, (2) whether termination is in the child's best interests, and (3) whether any exceptions save the parent-child relationship. *See* Iowa Code § 232.116(1)-(3); *In re A.B.*, 957 N.W.2d [280, 299 (Iowa 2021)]. The State must prove termination was proper by clear and convincing evidence. *In re A.B.*, 957 N.W.2d at 294; *In re A.M.*, 843 N.W.2d 100, 110–11 (Iowa 2014). "[O]nce the State has proven a ground for termination, the parent resisting termination bears the burden to establish an exception to termination" identified in section 232.116(3). *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018).

*W.T.*, 967 N.W.2d at 322 (second alteration in original).

Because neither parent challenges the existence of the grounds for termination, we need not address the first step. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

Moving to whether termination is in the children's best interests, we conclude terminating the mother's and F.Y.'s parental rights so the children can be permanently placed gives primary consideration to the children's safety, to the best placement for furthering their long-term nurturing and growth, and to their physical, mental, and emotional needs under section 232.116(2). The children are together in a concurrent plan foster home and have been there since July 14, 2022. They are settled, and their needs are being met. The foster parents have maintained a relationship with the maternal grandparents and state their intention to continue to do so if allowed to adopt. We hope very much for the mother's own sake that she follows through with her plans and can maintain her sobriety and stability. Yet, "[i]t is well-settled law that we cannot deprive a child of permanency after the State has

proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *Id.* at 41. For his part, F.Y. claims he can offer "continued support and love." We are not persuaded by his claim because he has never had contact with the child.

Finally, the mother asks that we apply the exception in section 232.116(3)(c), which allows the court to avoid termination where "[t]here is clear and convincing evidence that the termination would be detrimental to the child[ren] at the time due to the closeness of the parent-child relationship." There is no such evidence here. The mother has not even seen her children since September 2022 and she attended only twelve of about ninety offered visits since June 2021. We affirm the termination of each parent's parental rights.

**AFFIRMED ON BOTH APPEALS.**